2016 WL 5464543
Only the Westlaw citation is currently available.
United States District Court, S.D. California.

John T. SHAW; Kenneth Coke; and Raymond
Rydman, on behalf of themselves and all others
similarly situated, Plaintiffs,
v.
EXPERIAN INFORMATION SOLUTIONS, INC.,
Defendant.

Case No.: 13-CV-1295 JLS (BLM)
|
Signed 09/28/2016

**Attorneys and Law Firms**

Christopher Lane, G. John Cento, Cento Law, LLC, Eric S.
Pavlack, Pavlack Law, LLC, Indianapolis, IN, Matthew J.
Zevin, Stanley Iola, LLP, San Diego, CA, Mara McRae,
McRae Brooks Warner LLC, Atlanta, GA, for Plaintiffs.

Kelly V. O'Donnell, Jones Day, San Diego, CA, Adam W.
Wiers, Jones Day, Chicago, IL, for Defendant.

**ORDER: (1) OVERRULING DEFENDANT'S
EVIDENTIARY OBJECTIONS, (2) DENYING
DEFENDANT'S REQUEST FOR JUDICIAL
NOTICE, AND (3) GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Hon. Janis L. Sammartino, United States District Judge

**\*1** Presently before the Court is Defendant Experian
Information Solutions, Inc.'s Motion for Summary
Judgment or, in the Alternative, Summary Adjudication.
(MSJ, ECF Nos. 162, 167 (sealed).) Also before the Court
are Plaintiffs' John T. Shaw, Kenneth Coke, and Raymond
Rydman's Opposition to (ECF Nos. 171, 176 (sealed), 185
(sealed) and Defendant's Reply in Support of (ECF No.
178, 184 (sealed) the MSJ, as well as Defendant's Request
for Judicial Notice (RJN, ECF No. 162-10), Defendant's
Evidentiary Objections (Objs., ECF No. 178-1), and
Plaintiff's Response to Defendant's Objections (ECF No.
186). The Court held a hearing on September 1, 2016. (ECF

No. 187.) Having considered the parties' arguments and the
law, the Court **OVERRULES** Defendant's Evidentiary
Objections (ECF No. 178-1), **DENIES** Defendant's RJN
(ECF No. 162-10), and **GRANTS** Defendant's MSJ (ECF
No. 162).

**BACKGROUND**

**I. Factual Background**

*A. Data Furnishers' Reporting of Short Sales*

Defendant is a consumer reporting agency as defined by
the Fair Credit Reporting Act (FCRA), 15 U.S.C. §§
1681 et seq. (MSJ Mem. 9,[1] ECF No. 162-1; *see also* Decl.
of Kelly O'Donnell (O'Donnell Decl.) Ex. 36 at 17:18–
18:17, ECF No. 162-7 at 11–12.) Data furnishers, including
mortgage lenders and credit card companies, report credit
information to Defendant and other consumer reporting
agencies on a regular basis. (MSJ Mem. 9, ECF No. 162-
1; *see also* O'Donnell Decl. Ex. 36 at 17:6–17, ECF No.
162-7 at 11.)

Data furnishers typically report information in a standard
industry format called Metro 2, although some still utilize
the old Metro format. (Decl. of G. John Cento (Cento
Decl.) Ex. 9 at 358:21–360:2, ECF No. 171-13 at 10–12.)
The Consumer Data Industry Association (CDIA), the
industry's trade association, publishes an annual Credit
Reporting Resource Guide (CRRG) that outlines detailed
requirements for all subscribers using Metro 2 that wish to
report information to Defendant and its competitors. (Decl.
of Kimberly Hughes (Hughes Decl. ¶ 10, ECF No. 162-9;
*see also* Cento Decl. Exs. 1–6, ECF Nos. 171-3–8.)

The CRRG defines a short sale as:

> The sale of real estate in which the
> proceeds from the sale fall short of
> the balance owed on the loan, which
> is secured by the property sold. In a
> short sale, the lender agrees to
> discount the loan balance typically

due to an economic or financial hardship on the part of the consumer.

(*See, e.g.*, Cento Decl. Ex. 1 at 7-5, ECF No. 171-3 at 185.) Short sales are considered by lenders and credit scorers to be significant derogatory events. (Pl.'s Statement of Disputed & Undisputed Facts (Pl.'s Stmt.) 2, ECF No. 171-1 at 3.)

In 2009 and 2010, the CRRG instructed data furnishers to report a short sale using, in relevant part, an Account Status Code of "13 or 61-65, as applicable," a Special Comment of "AU (Account paid in full for less than the full balance)," and a Current Balance and Amount Past Due amount of zero. (Cento Decl. Ex. 1 at 6-18, ECF No. 171-3 at 167; Cento Decl. Ex. 2 at 6-27; ECF No. 171-4 at 179.) An Account Status Code of "13" indicated a "[p]aid or closed account/zero balance," while "61" through "65" meant the account was "paid in full," but there was a "voluntary surrender," "collection account," "repossession," "charge-off," or "foreclosure...started," respectively. (Cento Decl. Ex. 1 at 5-14, ECF No. 171-3 at 112; Cento Decl. Ex. 2 at 5-14, ECF No. 171-4 at 114.)

**\*2** The CRRG provided two options for reporting a short sale in 2011 and 2012. (*See* Cento Decl. Ex. 9 at 343:8–22, ECF No. 171-13 at 9; *see also* Cento Decl. Exs. 3–4, ECF Nos. 171-5–6.) In the first option, the real estate was sold for less than the full balance owed and the deficiency balance was forgiven. (Cento Decl. Ex. 3 at 6-39, ECF No. 171-5 at 195; Cento Decl. Ex. 4 at 6-39, ECF No. 171-6 at 195.) In those circumstances, the data furnisher was to report an Account Status Code of 13 (Paid or closed account/zero balance) or 65 (Account paid in full, a foreclosure was started), a Special Comment of AU (Account paid in full for less than the full balance), and a Current Balance and Amount Past Due of zero. (*Id.*) When the real estate was sold for less than the full balance but the deficiency balance was not forgiven, however, the furnisher reported the applicable Account Status Code specifying how the consumer was paying the deficiency balance; a Special Comment of "CM," meaning "[c]ollateral released by creditor/balance owing"; a Current Balance in the amount of the deficiency; and an Amount Past Due of the outstanding past due amount, if delinquent. (*Id.*)

In 2013 and 2014, the CRRG again proscribed one treatment for short sales, which again reported an Account Status Code of 13 (Paid or closed account/zero balance) or 65 (Account paid in full, a foreclosure was started) and a Special Comment of AU (Account paid in full for less than

the full balance), and a Current Balance and Amount Past Due of zero. (Cento Decl. Ex. 5 at 6-39, ECF No. 171-7 at 195; Cento Decl. Ex. 6 at 6-45, ECF No. 171-8 at 202.)

### *B. Defendant's Reporting of Short Sales*

Although data furnishers report information using Metro or Metro 2, Defendant and the other consumer reporting agencies each have different proprietary outputs and displays for the reports they generate. (Pl.'s Stmt. 7, ECF No. 171-1 at 6.) Defendant reports information in both credit reports (provided to subscribers) and consumer disclosures (provided to consumers). (MSJ Mem. 13, ECF No. 162-1 (citing 15 U.S.C. §§ 1681a(d), 1681g); *see also* Hughes Decl. ¶ 12, ECF No. 162-9.) Defendant and other consumer reporting agencies are regulated by the Consumer Financial Protection Bureau (CFPB). (O'Donnell Decl. Ex. 36 at 15:5–10, ECF No. 162-7 at 9.)

The vast majority of credit reports go to credit grantors, who read the information with computers. (Pl.'s Stmt. 18, ECF No. 176-1 at 15.) The information is therefore delivered in a computer-generated format "in segments and bits and bytes." (*Id.*) Defendant uses its own proprietary coding to report information to credit grantors. (Hughes Decl. ¶ 14, ECF No. 162-9.) Although this output is easily read by the computers of credit grantors with reference to Defendant's technical manuals, it is essentially incomprehensible to human beings. (Pl.'s Stmt. 18, ECF No. 171-1 at 15.)

Defendant's technical manuals include its Automated Response Format Specifications (O'Donnell Decl. Ex. 2, ECF No. 167-1 at 5–73 (sealed)) and its File One Appendix (O'Donnell Decl. Ex. 3, ECF No. 167-1 at 75–218 (sealed)), both of which Defendant provides to its subscribers (Hughes Decl. ¶ 13, ECF No. 162-9; *see also* Cento Decl. Ex. 95, ECF No. 162-91). In February 2010, for example, Scott Wright, Defendant's Senior Client Technical Services Representative, emailed "Tehnical [sic] Manual Access" information to Stacey Shifman at Fannie Mae. (O'Donnell Decl. Exs. 5–6, ECF No. 162-4 at 38, 40.)

Pursuant to its technical manuals, Defendant reports short sales to credit grantors in the following manner:

- Account Type (for a short sale, some kind of mortgage related account such as a first mortgage, home equity line of credit, etc.)

- Account Condition and Payment Status Code '68,' which corresponds to a status of "settled" and a

Special Comment of–Acct legally paid in full for less than the full balance. The '68' corresponds to the furnisher's reporting of Special Comment Code 'AU,' and it automatically populates a '9' into the first position o[f] the history grid to display the "settled" status.

• Payment History Grid showing the current/final status ("Settled") in the first entry, followed by 24 months of payment history information

**\*3** • Date of status for the 25th month in the payment history grid, corresponding to the date the "settled" status was reported to [Defendant].

(Hughes Decl. ¶ 15, ECF No. 162-9; *see also* O'Donnell Decl. Ex. 2 at 25, ECF No. 167-1 at 35 (sealed); O'Donnell Decl. Ex. 3 at 90, 121, ECF No. 167-1 at 174, 205 (sealed).) According to Defendant's technical manuals, the "9" that Defendant populates in the first position of its payment history grid can mean a number of things, including "Settled, Insurance Claim, Term Default, Government Claim, Paid by Dealer, BK Chapter 7, 11, or 12 Petitioner, or Discharged and BK Chapter 7, 11, or 12 Reaffirmation of Debt Rescinded." (O'Donnell Decl. Ex. 3 at 121, ECF No. 167-1 at 205 (sealed); *see also* Hughes Decl. ¶ 19, ECF No. 162-9.) A foreclosure, by contrast, is represented in Defendant's credit reports by the Account Condition and Payment Status Code "94," corresponding to a status of "foreclosed" and a special comment that "Credit Grantor reclaimed collateral to settle defaulted mortgage," and Payment History Grid initial code "8," indicating "Foreclosure Proceedings Started, Deed in Lieu" or "Foreclosure." (O'Donnell Decl. Ex. 3 at 91, 121, ECF No. 167-1 at 175, 205 (sealed); *see also* Hughes Decl. ¶ 18, ECF No. 162-9.)

Unlike a credit report, which contains industry codes and fields which are designed to be read by computers and which would be unfamiliar and meaningless to a lay consumer, the consumer disclosure uses a more elementary and easy-to-read format to convey the same information. (Hughes Decl. ¶¶ 17, 52, ECF No. 162-9.) Consequently, when reporting a short sale in a consumer disclosure, Defendant does not display the numerical code "9" in the leading position of the payment history grid. (Pl.'s Stmt. 20, ECF No. 171-1 at 16.) Instead, Defendant prints "CLS," representing that the account is "Closed." (Hughes Decl. ¶¶ 17, 56, ECF No. 162-9.) The file disclosure additionally notes that the account was "[p]aid in settlement," with a creditor's statement of "[a]ccount legally paid in full for less than full balance." (*Id.*)

## C. Fannie Mae's Interpretation of Defendant's Credit Reports

Fannie Mae, a government-sponsored enterprise, purchases loans from lenders. (Pl.'s Stmt. 29, ECF No. 171-1 at 24.) It creates its own rules governing which loans it may purchase, set forth in its Selling Guide, which are implemented through its proprietary computer software, Desktop Underwriter. (Pl.'s Stmt. 30, ECF No. 171-1 at 24.) Fannie Mae licenses Desktop Underwriter to lenders, which use the software to obtain recommendations about whether Fannie Mae would purchase a particular loan. (*Id.*)

In providing this recommendation, Desktop Underwriter analyzes loan application information, including credit report data. (Pl.'s Stmt. 31, ECF No. 171-1 at 24–25.) Consumer reporting agencies have no control over Fannie Mae's interpretation of this information, and the CFPB does not regulate it.[2] (*Id.*) Fannie Mae imposed a longer waiting period for prior foreclosures than for prior short sales. (Pl.'s Stmt. 32, ECF No. 171-1 at 25.)

**\*4** Fannie Mae's manner of payment code (MOP) corresponds to Defendant's initial payment history grid code. (Pl.'s Stmt. 35, ECF No. 171-1 at 26.) Until 2013, when Desktop Underwriter received a remarks code for "Paid Less than Owed," it would identify a possible short sale and recommend Accept unless there was an MOP code of 8 or 9. (Cento Decl. Ex. 47 at 149:18–150:5, ECF No. 171-50 at 38–39.) If there was an MOP code of 8 or 9, Desktop Underwriter would instead treat the mortgage account as a foreclosure and recommend a Refer with Caution. (Cento Decl. Ex. 47 at 151:12–19, ECF No. 171-50 at 40.)

This was because Fannie Mae's Selling Guide previously required that "[m]ortgage accounts...will be identified as a foreclosure if there is a current status or manner of payment/MOP code of '8' (foreclosure) or '9' (collection or charge-off)." (Pl.'s Stmt. 34, ECF No. 171-1 at 25–26.) Fannie Mae made the decision to treat "9's the same as "8's years before, even though the code "9" was not intended to represent foreclosures. (Pl.'s Stmt. 37, ECF No. 171-1 at 26; *see also* Cento Decl. Ex. 52, ECF No. 176-15 at 17 ("From time to time, delinquent mortgage tradelines are reported with a status or manner of payment code ("MOP" code) of M-9, which is defined by the credit agencies as either charged-off to bad debt or in collection. We have determined, however, that M-9 accounts are actually foreclosures, and as such, we have modified the rules in Desktop Underwriter to treat tradelines with an M-9 status code as a foreclosure.") (sealed).) Prior to reprogramming its Desktop Underwriter software in 2013, the only way to override Fannie Mae's software's identification of a potential foreclosure was to have a loan officer manually

underwrite the loan. (Pl.'s Stmt. 41, ECF No. 171-1 at 28; *see also* Cento Decl. Ex. 47 at 151:12–152:1, ECF No. 171-50 at 40–41.)

Defendant first became aware of this issue in 2010, when it began to receive consumer disputes from consumers who were denied a mortgage because Defendant was "showing a foreclosure on their file." (Cento Decl. Ex. 43 at 86:4–14, ECF No. 171-47.) In 2011 and 2012, Defendant heard from a number of sources that consumers' short sales were being identified as foreclosures by Fannie Mae's Desktop Underwriter because of the use of the MOP code 9. (*See, e.g.*, Cento Decl. Ex. 55, ECF No. 176-16 (April 2012 email from TNG Mortgage Consultants) (sealed); Cento Decl. Ex. 57, ECF No. 176-17 (August 2011 email from Informative Research) (sealed); Cento Decl. Ex. 58, ECF No. 171-59 (October 2012 email from CitiMortgage); Cento Decl. Ex. 59, ECF No. 171-60 (January 2012 email from Service 1st Information Systems); *see also* Cento Decl. Ex. 142, ECF No. 171-145 (demonstrative of exhibits demonstrating "confusion and complaints about code 9") (emphasis omitted).)

When Defendant addressed the issue with Fannie Mae, Fannie Mae "responded that they would 'not' be changing their Desktop Underwriter as they do not have the resources and [Defendant] is the only bureau reflecting 'AU' (settled accounts) as a '9.' " (Cento Decl. Ex. 58, ECF No. 171-59 at 3.) Defendant also resisted changing its coding. (*See* Cento Decl. Ex. 109, ECF No. 171-105 at 5.)

In 2013, federal regulators became concerned that applicants with short sales were being prevented from obtaining mortgages. (Pl.'s Stmt. 42, ECF No. 171-1 at 28–29.) In June of that year, the CFPB "describe[d] the solution as: [¶] '[Defendant] could reprogram it's [sic] system or Fannie Mae could reprogram its system.' " (Cento Decl. Ex. 109, ECF No. 171-105 at 6.) Brian Webster of the CFPB also noted in a Mortgage Markets Research, Markets & Regulations memorandum that the CFPB's "investigation discovered that the underlying problem was not due to inaccurate reporting by furnishers or the credit reporting companies, but rather an issue of conflicting information being presented on the consumer's credit tradeline within the tri-merge credit reports." (O'Donnell Decl. Ex. 39, ECF No. 162-7 at 57; O'Donnell Decl. Ex. 36 at 74:3–75:25, ECF No. 162-7 at 40–41.) Tri-merge reports take credit reports from Defendant, Equifax, and TransUnion—the three nationwide credit bureaus—and create a single document. (O'Donnell Decl. Ex. 36 at 17:18–25, 18:18–25, ECF No. 162-7 at 11–12.) Although Mr. Webster later "essentially rescinded" that memorandum (*see* Cento Decl. Ex. 128, ECF No. 171-122), "not much changed in terms of [the CFPB's] views

going forward" (O'Donnell Decl. Ex. 36 at 74:2–3, ECF No. 162-7 at 41). In other words, Mr. Webster was of the opinion that the issue was with the merged-report technology providers. (*See* Cento Decl. Ex. 128, ECF No. 171-122.)

**\*5** In May 2013, Defendant, Equifax, and TransUnion approved a new short sale code as a potential solution. (Cento Decl. Ex. 103, ECF No. 171-99 at 3.) Defendant was willing to implement the new code in February 2014. (Centro Decl. Ex. 104, ECF No. 171-100.)

Meanwhile, Fannie Mae updated its Selling Guide in October 2013 to recognize that "[short sales] may not be accurately or consistently reported in the same manner by all creditors or credit reporting agencies." (O'Donnell Decl. Ex. 48 at 486, ECF No. 162-7 at 106.) The Selling Guide further provided that "[m]ortgage accounts...will be identified as a foreclosure if there is an MOP code of '8'....[¶] [and] also...if there is a current MOP code of '9' (collection or charge-off) and there are no deed-in-lieu of foreclosure (DIL) or [short sale] Remarks Codes associated to the tradeline." (O'Donnell Decl. Ex. 48 at 495, ECF No. 162-7 at 115.) Consequently, "[Desktop Underwriter] will determine if a mortgage tradeline is a [short sale] by using specific Remarks Codes that are present in the credit report data and associated to the tradeline." (O'Donnell Decl. Ex. 48 at 497, ECF No. 162-7 at 117.) The lender would then have to confirm the accuracy of a reported short sale. (*Id.*)

Fannie Mae further revised its Selling Guide in 2014, such that foreclosures would be identified by "an MOP code of '8,' or a Remarks Code that indicates a foreclosure is present in the credit report data and associated to the tradeline" (O'Donnell Decl. Ex. 49 at 509–10, ECF No. 162-7 at 138–39), whereas "[Desktop Underwriter] will determine if a mortgage is a [short sale] by using specific Remarks Codes that are present in the credit report data and associated to the tradeline" (O'Donnell Decl. Ex. 49 at 511, ECF No. 162-7 at 140), "such as 'Settled for less than full balance' " (O'Donnell Decl. Ex. 49 at 498–99, ECF No. 162-7 at 127–28.)

### D. Plaintiff's Short Sales and Subsequent Loan Applications

Plaintiff Shaw had a short sale in March 2010. (Pl.'s Stmt. 53, ECF No. 171-1 at 34.) When Plaintiff Shaw later sought to move to a new state, he ran his own information through Fannie Mae's Desktop Underwriter, which indicated that he had a foreclosure. (Pl.'s Stmt. 54, ECF No. 171-1 at 34.) Plaintiff Shaw later applied for a custom construction loan

with Banner Bank, which used Freddie Mac's underwriting software, Loan Prospector. (*See* O'Donnell Decl. Ex. 19 at 13:17–24, 37:15–19, ECF No. 162-4 at 120, 123; *see also* O'Donnell Decl, Exs. 20–21, ECF Nos. 167-4–5 (sealed).) Loan Prospector informed Banner Bank that "[t]he Borrower has had a short sale/deed-in-lieu of foreclosure within the last seven years." (O'Donnell Decl. Ex. 20, ECF No. 167-4 at 6; O'Donnell Decl. Ex. 21, ECF No. 167-4 at 14.) Banner Bank understood this to mean that Plaintiff Shaw had a short sale. (O'Donnell Decl. Ex. 19 at 35:25–37:5, 38:24–39:2 46:6–11, ECF No. 162-4 at 121–23, 124–25, 127.) Banner Bank ultimately originated the loan for which Plaintiff Shaw applied (O'Donnell Decl. Ex. 19 at 39:11–13, ECF No. 162-4 at 125), but Plaintiff Shaw claims that he would have received a lower interest rate if Defendant had not reported his short sale with a 9 and that the extreme stress he suffered during this period was a possible factor in his contracting a viral infection (*see* Cento Decl. Ex. 91 at 193:19–197:23, 207:16–208:24, 222:4–224:22, ECF No. 171-87 at 7–16).

**\*6** Plaintiff Coke completed a short sale in April 2011, which Wells Fargo reported to Defendant in May 2011. (O'Donnell Decl. Ex. 9 at 3, ECF No. 167-1 at 227 (sealed).) In 2012, Plaintiff Coke obtained a mortgage from Commonwealth Bank, which used a private underwriting system that correctly identified Plaintiff Coke's short sale. (Pl.'s Stmt. 57, ECF No. 171-1 at 35.) When Commonwealth Bank sought to underwrite a subsequent mortgage loan for Plaintiff Coke in March 2013, it used Fannie Mae's Desktop Underwriter, which identified a possible foreclosure based on Defendant's use of the numerical code 9. (Pl.'s Stmt. 58, ECF No. 176-1 at 35.) Commonwealth Bank had a policy not to manually underwrite loans that Desktop Underwriter referred with caution. (O'Donnell Decl. Ex. 24 at 20:8–23, 39:19–23, ECF No. 162-4 at 168, 172.) Ultimately, however, Plaintiff Coke did receive a loan from Commonwealth Bank. (O'Donnell Decl. Ex. 24 at 100:16–18, ECF No. 162-4 at 202.) Plaintiff Coke alleges that the loan he ultimately received had a higher interest rate and that he suffered stress and embarrassment. (*See* Cento Decl. Ex. 93 at 80:17–20, 112:6–113:7, 115:4–9, 122:1–125:25, ECF No. 171-89 at 11, 14–20; Cento Decl. Ex. 168, ECF No. 171-170 at 17.)

Plaintiff Rydman had a short sale in June 2011. (Pl.'s Stmt. 60, ECF No. 171-1 at 36.) In 2013, Plaintiff Rydman applied for a mortgage and Fannie Mae's Desktop Underwriter identified a possible foreclosure. (Pl.'s Stmt. 61, ECF No. 171-1 at 36–37.) The lender's policy did not allow for manual underwriting. (*Id.*) Plaintiff Rydman applied for another mortgage in 2014. (Pl.'s Stmt. 62, ECF No. 171-1 at 37.) The bank knew of Plaintiff Rydman's

short sale and never thought that he had a foreclosure. (*Id.*) Fannie Mae's Desktop Underwriter also said nothing about a potential foreclosure. (*Id.*) Consequently, Plaintiff Rydman's application was approved with no problems. (*Id.*) Plaintiff Rydman alleges, however, that he was unable to "get in the market before it went up," leading him to over $50,000 in claimed losses. (*See* Cento Decl. Ex. 170, ECF No. 171-172 at 17; *see also* Cento Decl. Ex. 92 at 85:1–90:4, ECF No. 171-88 at 13–18.)

### E. Plaintiffs' Consumer Disclosures and Disputes

Plaintiff Shaw received copies of his consumer disclosure from Defendant on August 18, 2012 (O'Donnell Decl. Ex. 14, ECF No. 167-3 at 2–29 (sealed)) and December 12, 2012 (Cento Decl. Exs. 62–63, 115, ECF Nos. 171-63–64, 171-109 (sealed)). Plaintiff Shaw wrote letters to Wells Fargo Home Equity (Cento Decl. Ex. 64, ECF No. 176-19 (sealed)) and Defendant (Cento Decl. Ex. 146, ECF No. 185 (sealed)) on December 12, 2012. Plaintiff Shaw requested the Defendant remove the "9" from his past payment codes. (Cento Decl. Ex. 64, ECF No. 176-19 at 2 (sealed); Cento Decl. Ex. 146, ECF No. 185 at 2 (sealed).) Plaintiff Shaw followed up with Wells Fargo on December 26, 2012. (Cento Decl. Ex. 65, ECF No. 176-20 (sealed).) Plaintiff Shaw received dispute responses from Defendant dated September 19, 2013 (Cento Decl. Ex. 164, ECF No. 171-166) and September 23, 2013 (Cento Decl. Ex. 163, ECF No. 171-165).

Plaintiff Coke received copies of his consumer disclosure from Defendant dated March 15, 2012 (O'Donnell Decl. Ex. 9, ECF No. 167-1 at 225–44 (sealed); Cento Decl. Ex. 117, ECF No. 171-111) and June 4, 2013 (O'Donnell Decl. Ex. 8 at 75:6–18, ECF No. 162-4 at 48; O'Donnell Decl. Ex. 11, ECF No. 167-1 at 253–72 (sealed)). Plaintiff Coke wrote a letter to Defendant on June 4, 2013 noting that "[b]oth Trans Union and Equifax's reports...rate [my previous Wells Fargo mortgage account] as a 1. Experian was the only credit reporting company that rated my Wells Fargo account as a 9. Apparently a 9 rated [sic] means foreclosure, bankruptcy, etc. which is not what I had with Wells Fargo." (O'Donnell Decl. Ex. 10, ECF No. 167-1 at 246 (sealed); Cento Decl. Ex. 148, ECF No. 171-151.) Plaintiff Coke received dispute responses dated June 14, 2013 (Cento Decl. Ex. 158, ECF No. 171-161) and July 1, 2013 (Cento Decl. Ex. 159, ECF No. 171-162).

Plaintiff Rydman received copies of his consumer disclosure from Defendant dated June 3, 2013 (O'Donnell Decl. Ex. 16 at 34:5–8, ECF No. 162-4 at 103; O'Donnell Decl. Ex. 18, ECF No. 167-3 at 50–83 (sealed)) and

November 13, 2013 (Cento Decl. Ex. 116, ECF No. 171-110). On June 17, 2013, Plaintiff Rydman requested that Defendant "update [the] status to shortsale" for his Wells Fargo account. (Cento Decl. Ex. 147, ECF No. 171-150 at 2.) Plaintiff Rydman received dispute responses dated June 17, 2013 (Cento Decl. Ex. 160, ECF No. 171-163) and September 19, 2013 (Cento Decl. Ex. 161, ECF No. 171-164).

## II. Procedural Background

**\*7** Plaintiff Shaw filed this putative class action on June 3, 2013 against Wells Fargo Bank, N.A. and CitiMortgage, Inc. (the Furnisher Defendants) and Defendant, alleging four violations of the FCRA. (ECF No. 1.) A first amended complaint (FAC) was filed on behalf of Plaintiffs on August 19, 2013. (ECF No. 30.)

In September 2013, the Furnisher Defendants moved to dismiss Plaintiffs' FAC (ECF Nos. 35, 36), while Defendant filed an answer (ECF No. 37). The Court granted the Furnisher Defendants' motions to dismiss on May 7, 2014. (ECF No. 55.) On May 20, 2014, Plaintiffs filed the operative second amended complaint (SAC). (ECF No. 56.)

On June 6, 2014, the Furnisher Defendants again moved to dismiss (ECF Nos. 58, 60), while Defendant filed an answer (ECF No. 59). On September 29, 2014, the Court granted in part and denied in part the Furnisher Defendants' motions to dismiss. (ECF No. 70.) The parties later stipulated to the dismissal with prejudice of the Furnisher Defendants. (ECF Nos. 93, 113.)

Meanwhile, Plaintiffs moved for class certification (ECF No. 103) and filed a *Daubert* motion (ECF No. 140), while Defendant filed motions for summary judgment (ECF No. 115) and to stay the hearing on Plaintiff's motion for class certification pending the Supreme Court's decision in *Spokeo, Inc. v. Robins*, 135 S. Ct. 1892 (2015) (ECF No. 129). On October 26, 2015, the Court stayed this action pending a decision in *Spokeo* and denied without prejudice the remaining pending motions. (ECF No. 148.)

Following the Supreme Court's resolution of *Spokeo* on May 16, 2016, the Court lifted the stay on June 20, 2016. (ECF No. 159.) On July 14, 2016, Defendant filed the instant MSJ. (ECF No. 162.)

## EVIDENTIARY OBJECTIONS

Accompanying its Reply, Defendant submits a list of evidentiary objections to 120 of Plaintiffs' exhibits. (*See generally* Objs., ECF No. 178-1.) Plaintiffs' twenty-five-page response criticizes Defendant's "scattershot approach," the vagueness of Defendant's objections, and Defendant's reliance upon an outdated version of Rule 56 to challenge unauthenticated documents. (*See generally* Resp., ECF No. 186.)

"The Court is mindful of the need to consider the quality of evidence presented in support of or opposition to a summary judgment motion...[and] has thoroughly reviewed and considered the voluminous record, including all evidence, arguments, points and authorities, declarations, testimony, objections and other papers filed by the parties." *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12CV146 L BLM, 2014 WL 1286561, at \*16 (S.D. Cal. Mar. 31, 2014). "To the extent that the evidence is proper under the Federal Rules of Evidence, the Court considered the evidence. To the extent that the evidence is not proper, the Court did not consider [it]." *Hammitt v. Lumber Liquidators, Inc.*, 19 F. Supp. 3d 989, 1003 (S.D. Cal. 2014). The Court therefore **OVERRULES** Defendant's Evidentiary Objections. (ECF No. 178-1.)

## REQUEST FOR JUDICIAL NOTICE

Federal Rule of Evidence 201(b) provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Judicially noticed facts often consist of matters of public record, such as prior court proceedings...or other court documents." *Botelho v. U.S. Bank, N.A.*, 692 F. Supp. 2d 1174, 1178 (N.D. Cal. 2010) (citation omitted); *see also Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) (The court "may take judicial notice of court filings and other matters of public record.").

**\*8** Defendant asks the Court to take judicial notice of eight exhibits, all of which are filings or docket reports in two other cases, *McCalmont v. Federal National MortgageAssociation*, No. 2:13-cv-02107 (D. Ariz. Oct. 16 2013) and *Zabriskie v. Federal National Mortgage*

*Association*, 2:13-cv-02260 SRB (D. Ariz. Nov. 5, 2013). (*See* RJN 2–3, ECF No. 162-10.) While "[a] court may take judicial notice of the existence of matters of public record, such as a prior order or decision," it should not take notice of "the truth of the facts cited therein." *See Marsh v. San Diego Cnty.*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006). Consequently, "[t]o the extent that [Defendant] seeks to admit findings contained these materials for the truth of the matters they assert, judicial notice is not appropriate[, and]...[t]o the extent [Defendant] seeks to cite materials that support its arguments, judicial notice is unnecessary...." *Banneck v. HSBC Bank USA, N.A.*, No. 15-CV-02250-HSG, 2016 WL 3383960, at *2 (N.D. Cal. June 20, 2016) (citing *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1117 n.14 (9th Cir. 2005); *Wyatt v. Terhune*, 315 F.3d 1108, 1114 n.5 (9th Cir. 2003)). The Court therefore **DENIES** Defendant's RJN. (ECF No. 162-10.)

## MOTION FOR SUMMARY JUDGMENT

### I. Legal Standard

Summary judgment is appropriate where the Court is satisfied that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those that may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the Court considers the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The initial burden of establishing the absence of a genuine issue of material fact falls on the moving party. *Celotex*, 477 U.S. at 323. The moving party may meet this burden by identifying the "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' " that show an absence of dispute regarding a material fact. *Id.* When a party seeks summary judgment as to an element for which it bears the burden of proof, "it must come forward with evidence which would entitle it to a directed verdict if the evidence

went uncontroverted at trial." *See C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)).

Once the moving party satisfies this initial burden, the nonmoving party must identify specific facts showing that there is a genuine dispute for trial. *Celotex*, 477 U.S. at 324. This requires "more than simply show[ing] that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts' " that would allow a reasonable fact finder to return a verdict for the non-moving party. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. While "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment,...summary judgment is not warranted if a reasonable jury could return a verdict for the nonmoving party." *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012) (emphasis in original) (quoting *Anderson*, 477 U.S. at 247–48) (internal quotation marks omitted).

### II. Analysis

**\*9** Plaintiffs' SAC alleges three claims against Defendant for violating the following provisions of the FCRA: (1) 15 U.S.C. § 1681e, (2) 15 U.S.C. § 1681i, and (3) 15 U.S.C. § 1681g. (SAC ¶¶ 103–25, ECF No. 56.) Defendant moves for summary judgment or, alternatively, summary adjudication in its favor on all of Plaintiff's surviving claims. (MSJ 2, ECF No. 162.)

### A. First and Second Causes of Action: 15 U.S.C. §§ 1681e and 1681i

Plaintiffs' first cause of action is brought under 15 U.S.C. § 1681e, which provides that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum

possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Pursuant to 15 U.S.C. § 1681i, the provision of the FCRA upon which Plaintiffs' second cause of action is predicated,

> if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information...before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

15 U.S.C. § 1681i(a)(1)(A).

Both provisions require Plaintiffs to make a prima facie showing of inaccurate reporting. *See Carvalho v. Equifax Info. Servs., LLC,* 629 F.3d 876, 890 (9th Cir. 2010) (quoting *Dennis v. BEH-1, LLC,* 520 F.3d 1066, 1069 (9th Cir. 2008)) (addressing § 1681i); *Guimond v. Trans Union Credit Info. Co.,* 45 F.3d 1329, 1333 (9th Cir. 1995) (citing *Cahlin v. Gen. Motors Acceptance Corp.,* 936 F.2d 1151, 1156 (11th Cir. 1991)) (addressing § 1681e(b)). "[A]n item on a credit report can be 'incomplete or inaccurate' ...'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.' " *Carvalho,* 629 F.3d at 890 (quoting *Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1163 (9th Cir. 2009)).

Defendant argues that "Plaintiffs cannot demonstrate a triable issue over whether [Defendant]'s reporting was inaccurate or misleading." (MSJ Mem. 22, ECF No. 162-1.) Plaintiffs counter that "[i]f a report is conflicting, the data display problematic, or further efforts are necessary for accuracy, then surely there is not maximum possible

accuracy." (Opp'n 23, ECF No. 176.) Moreover, the accuracy of Defendant's reports is more appropriately a question for a jury. (*See id.* at 24) (quoting *Valentine v. First Advantage Saferent, Inc.,* No. EDCV 08-142 VAP (OPX, 2009 WL 4349694, at *8 (C.D. Cal. Nov. 23, 2009)) (citing *Koropoulos v. Credit Bureau, Inc.,* 734 F.2d 37, 42 (D.C. Cir. 1984); *Yourke v. Experian Info. Solutions, Inc.,* No. C 06-2370 CW, 2007 WL 1795705, at *4 (N.D. Cal. June 20, 2007)).)

The Court finds *Banneck,* the case upon which Defendant chiefly relies (*see* MSJ Mem. 18, ECF No. 162-1; Reply 9–10, ECF No. 178), persuasive. In *Banneck,* as in this case, plaintiff completed a short sale and Defendant reported it using an account condition and payment status code of 68 and an initial payment history grid code of 9. 2016 WL 3383960, at *1, *3–4. Also as in this case, plaintiff applied for a subsequent mortgage loan and, when the lender ran plaintiff's application—including a tri-merge credit report— through Fannie Mae's Desktop Underwriter software, it issued a Refer with Caution recommendation because of Defendant's use of the numerical code 9. *Id.* at *4. The district court in *Banneck* granted summary judgment on plaintiff's claims arising under §§ 1681e and 1681i, *id.* at *8, *9, reasoning that to the extent plaintiff's claims relied on a theory that Defendant reported his sale as a foreclosure, "[plaintiff] has produced no evidence that Experian reported his short sale as anything other than a short sale," *id.* at *6.

*10 The court then proceeded to "[t]he more difficult question [of] whether Experian is entitled to judgment as a matter of law on the claim that it reported [plaintiff]'s short sale in a technically correct but materially misleading manner." *Id.* Ultimately, the court found "that Experian's simultaneous reporting of the numerical code '68,' which no one disputes refers only to a short sale, ... is dispositive in favor of Experian." *Id.* at *7. Relying on *Toliver v. Experian Information Solutions, Inc.,* 973 F. Supp. 2d 707 (S.D. Tex. 2013), the court reasoned that "[t]he use of a code that has multiple meanings is not misleading where the credit reporting agency clarifies which credit event is actually being reported with an undisputedly clear additional code." *Banneck,* 2016 WL 3383960, at *7. Additionally, "[t]hat Fannie Mae programmed its underwriting software in a manner that misinterpreted Experian's credit reporting codes does not change the analysis" because the 'materially misleading' standard is objective" and "Experian's reporting, which the Court finds was not misleading as a matter of law, did not become misleading by virtue of the fact that Experian may have known an end user was incorrectly interpreting it." *Id.*

Perhaps tellingly, Plaintiffs do not attempt to distinguish *Banneck* in any meaningful fashion. (*See* Opp'n 26, ECF No. 176.) Plaintiffs instead hang their hat on the fact that the "plaintiff [in *Banneck*] did not designate even a fraction of the evidence presented here." (*Id.*; *see also* MSJ Hr'g Tr. 22:17–23:18.[3]) True, Plaintiffs have introduced over 4,500 pages of briefing and exhibits in opposition to Defendant's MSJ. (*See generally* ECF Nos. 171, 176 (sealed).) But that veritable mountain of evidence does not create a triable issue of material fact where the plaintiff in *Banneck* failed.

Here, as in *Banneck*, Defendant reported Plaintiffs' short sales using both the numerical code 68 in the account condition and payment status field and a numerical code 9 in as the leading digit of the payment history grid. (*See* O'Donnell Decl. Ex. 15, ECF No. 167-3 at 31, 33, 36 (sealed); *see also* Hughes Decl. ¶¶ 49–51, ECF No. 162-9.) Defendant also provided to Fannie Mae—and its other subscribers—its technical manuals, which indicated that an account condition and payment status code of 68 meant "Account legally paid in full for less than the full balance" and that a payment profile code 9 meant, among a number of other things, "Settled." (*See* O'Donnell Decl. Ex. 2 at 25, ECF No. 167-1 at 35 (sealed); O'Donnell Decl. Ex. 3 at 90, 121, ECF No. 167-1 at 174, 205 (sealed); O'Donnell Decl. Exs. 5–6, ECF Nos. 167-1 at 38, 40; *see also* Hughes Decl. ¶¶ 13, 18–19, 21, 23, 30, ECF No. 162-9.) It was well understood within the industry that mortgage accounts legally paid in full for less than the full balance would generally indicate a short sale and never a foreclosure. (*See, e.g.*, O'Donnell Decl. Ex. 22 at 28:8–15, ECF No. 162-4 at 148; O'Donnell Decl. Ex. 34 at 26:22–27:2, 36:1–13, 39:12–17, ECF No. 167-7 at 15–16, 19, 21 (sealed); O'Donnell Decl. Ex. 36 at 28:20–25, ECF No. 162-7 at 22 (sealed); O'Donnell Decl. Ex. 40 at 17:21–18:3, ECF No. 167-7 at 51–52 (sealed); Hughes Decl. ¶ 55, ECF No. 162-9.) In light of these facts, Defendant could not be expected to anticipate that Fannie Mae would choose to interpret Defendant's credit reports contrary to its explicit instructions.

The evidence Plaintiffs introduce does not compel a different conclusion. Plaintiffs introduced abundant evidence concerning "confusion and complaints about code 9" (*see, e.g.*, Cento Decl. Ex. 142, ECF No. 171-145 (emphasis omitted)), but none of the underlying exhibits demonstrates that any underwriting software other than Fannie Mae's Desktop Underwriter was unable to accurately identify a short sale because of Defendant's use of the initial grid code 9. Plaintiffs stress the CFPB's supposed rescission of the Short Sale Credit Reporting and Evaluation: Next Steps memorandum (*see, e.g.*, Opp'n 21–22, 27, 29, ECF No. 171), but the email expressing that Mr. Webster "essentially rescinded his original memo" also

indicates that "[h]e does not believe that it is a question for nationwide credit bureau repositories (EFX, EXP, TU)[, but rather i]t is a question for merged-report technology providers" (Cento Decl. Ex. 128, ECF No. 171-122 at 2). There is no evidence in the record that Mr. Webster ever changed his initial conclusion that "the underlying problem was not due to inaccurate reporting by...the credit reporting companies." (*See* O'Donnell Decl. Ex. 39, ECF No. 162-7 at 57.) Plaintiffs also emphasize the importance of Exhibit 24, in which Ms. Finneran responds to Fannie Mae's inquiry concerning "identif[ication of] short sales in the Experian data" with the revelation that "[t]here are no specific codes that will specifically identify a [sic] Short Sale condition. The data reporting guidelines instruct the client to report the account as Settled-Special Comment AU. So the presence of this comment on a Mortgage loan 'could' imply short sale." (Cento Decl. Ex. 24, ECF No. 171-28.) This e-mail, however, appears to be addressing Metro 2 codes, not Defendant's proprietary codes, including the payment history code 9 that is so central to this litigation; consequently, the Court is hard-pressed to recognize the significance that Plaintiffs' impute to it. At the hearing, Plaintiffs argued that Defendant's technical manuals did not add "settled" to the definition for code 9 until 2013 (MSJ Hr'g Tr. 10:2–5), but Plaintiffs' briefing and exhibits indicate that it was actually added in March 2009 (*see* Opp'n 11, ECF No. 171; Cento Decl. Ex. 18 at iii, ECF No. 176-9 at 6 (sealed)).

**\*11** In light of the foregoing, the Court **GRANTS** Defendant's MSJ with respect to Plaintiffs' first and second causes of action.

### B. Third Cause of Action: 15 U.S.C. § 1681g

Under 15 U.S.C. § 1681g, "[e]very consumer reporting agency shall, upon request, ...clearly and accurately disclose to the consumer:...[¶] All information in the consumer's file at the time of the request...." 15 U.S.C. § 1681g(a)(1).

Plaintiffs do not clearly articulate precisely what information Defendant failed to disclose. Although they note that "[t]hey wanted to dispute the code 9, which Experian did not show them" (Opp'n 25, ECF No. 176), they also concede that "[n]o one claims Experian must show the actual codes" (*id.* at 26). At the hearing, Plaintiffs reiterated that they were not seeking Defendant's coding, but faulted Defendant for failing to incorporate the "equivalent" to a code 9 in its consumer disclosures. (MSJ Hr'g Tr. 13:3–12; 24:10–25:2.) Plaintiffs' unwillingness—or inability—to identify with specificity the alleged inaccuracy in Defendant's consumer disclosures is itself

fatal to Plaintiffs' claim.

But Plaintiffs' claim also fails because the information they seek—whatever it is— is outside the purview of § 1681g. Although "there is a paucity of case law interpreting this provision," see Guimond, 45 F.3d at 1334, Gillespie v. Trans Union Corp., 482 F.3d 907 (7th Cir. 2007) is instructive. In Gillespie, the plaintiffs sued under § 1681g(a)(1) for the defendant's failure to include in their consumer reports a "purge date," the date when delinquent account information would be removed from the report, which was generated solely for internal purposes. 482 F.3d at 908. The Seventh Circuit affirmed the district court's grant of summary judgment in defendant's favor, concluding that " 'file' means information included in a consumer report," which did not include purge dates. Id. at 908, 910. In reaching this conclusion, the Seventh Circuit took into account the statutory language, the Federal Trade Commission's commentary, and the Senate Committee Report discussing the 1996 amendments to the FCRA, which "suggest[ed] Congress wanted consumers to receive exactly what [plaintiffs] got from [defendant]—complete copies of their consumer reports, not their entire files in whatever form maintained by the CRA." Id. at 909–10.

Here, as in Gillespie, Plaintiffs received complete copies of their consumer reports. They are not entitled to that information in the form maintained by Defendant, see id. at 909, and Defendant need not provide information that is not provided to third parties,[4] see id. at 910. Accordingly, the Court GRANTS Defendant's MSJ with respect to Plaintiffs' third cause of action.

### C. Willfulness Under 15 U.S.C. § 1681n

*12 Because Plaintiffs seek damages pursuant to 15 U.S.C. § 1681n (see SAC ¶¶ 108, 116, 124, ECF No. 56), they must establish that Defendant "willfully fail[ed] to comply" with the provisions of the FCRA, see 15 U.S.C. § 1681n(a).[5] Willfulness requires a showing that Defendant knowingly or recklessly violated the FCRA's standards. See Safeco Ins. Co. of Am. v. Burr, 551 U.S. 47, 57 (2007). "[A] company subject to FCRA does not act in reckless disregard of it unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless." Id. at 69. In other words, the company's reading of the statute must be "objectively

unreasonable" in light of "the statutory text and relevant court and agency guidance." Id. at 69–70 & n.20.

Defendant argues that "the very fact that the Northern District [in Banneck] found Experian's short sale reporting to be accurate and reasonable—even if this Court disagrees—supports the objective reasonableness of Experian's procedures and docms Plaintiffs' willfulness claims" under §§ 1681e(b) or 1681i. (MSJ Mem. 28, ECF No. 162-1.) With respect to Plaintiffs' § 1681g cause of action, Defendant claims that "Plaintiffs cannot show that Experian acted 'recklessly' or that Experian was 'objectively unreasonable' by failing to provide some type of cautionary footnote regarding Fannie Mae's underwriting systems" given the Seventh Circuit's decision in Gillespie. (Reply 7, ECF No. 178 (citing Safeco, 551 U.S. at 50, 69–70).) Plaintiffs counter that willfulness "is almost always a jury question" and that "[a] brief timeline of Experian's actions reveals willful, reckless disregard of its obligations." (Opp'n 27, ECF No. 176 (citing Guimond, 45 F.3d at 1333; Edwards v. Toys "R" Us, 527 F. Supp. 2d 1197, 1210 (C.D. Cal. 2007) (collecting cases)).)

Here there is no statutory, court, or agency guidance suggesting that Defendant's short sale reporting—either in credit reports or consumer disclosures—was objectively unreasonable. To the contrary, the CFPB—the regulatory agency with supervisory and examination powers over Defendant (O'Donnell Decl. Ex. 36 at 15:5–10, ECF No. 162-7 at 9)—issued a memorandum noting that its "investigation discovered that the underlying problem [to the inaccurate identification of short sales as foreclosures by Fannie Mae's Desktop Underwriter] was not due to inaccurate reporting by furnishers or the credit reporting companies" (O'Donnell Decl. Ex. 39, ECF No. 162-7 at 57). Although the CFPB later "essentially rescinded" that memorandum (Cento Decl. Ex. 128, ECF No. 171-122), the CFPB never subsequently informed Defendant that it had changed this conclusion or advised Defendant that it had done anything wrong or should do anything differently (O'Donnell Decl. Ex. 29 at 64:18–65:23, ECF No. 162-4 at 258–59). In light of this evidence that Defendant's regulatory agency did not fault its reporting of short sales, the Court cannot conclude that Defendant's reporting of short sales was objectively unreasonable. Similarly, the Seventh Circuit's 2007 guidance that consumers are entitled to "complete copies of their consumer reports, not their entire files in whatever form maintained by the CRA," see Gillespie, 482 F.3d at 909–10, precludes the Court from concluding that Defendant's exclusion of the numerical grid code 9 from its consumer disclosures was

objectively unreasonable.

**\*13** Consequently, for this independent reason, the Court **GRANTS** Defendant's MSJ as to all three of Plaintiff's causes of actions.

## CONCLUSION

In light of the foregoing, the Court **OVERRULES** Defendant's Evidentiary Objections (ECF No. 178-1),

**DENIES** Defendant's RJN (ECF No. 162-10), and **GRANTS** Defendant's MSJ (ECF No. 162). This Order concludes the litigation in this matter. The Clerk of the Court shall close the file.

**IT IS SO ORDERED.**

Dated: September 28, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 5464543

Footnotes

1    Pin citations to docketed materials refer to the CM/ECF page numbers electronically stamped at the top of each page.

2    Fannie Mae is instead regulated by the Federal Housing Finance Authority (FHFA). (*See* O'Donnell Decl. Ex. 36 at 22:20–25, ECF No. 162-7 at 16.)

3    The Court cites to an unofficial copy of the transcript. Citations to page numbers should be identical to those in the copies available to the parties.

4    As for Plaintiffs' contention that the information disclosed in the consumer disclosures was not "equivalent" to that contained in credit reports (*see, e.g.*, MSJ Hr'g Tr. 13:3–12; 24:10–25:2.), the Court does not find this argument persuasive. Defendant's credit reports identified short sales using an Account Condition and Payment Status Code of 68 (status of "settled" and Special Comment of-Acct legally paid in full for less than the full balance) and a leading Payment History Grid code of 9 ("settled"). (*See* Hughes Decl. ¶ 15, ECF No. 162-9; *see also* O'Donnell Decl. Ex. 2 at 25, ECF No. 167-1 at 35 (sealed); O'Donnell Decl. Ex. 3 at 90, 121, ECF No. 167-1 at 174, 205 (sealed).) Defendant's consumer disclosures indicate a short sale with the notation that the account was "[p]aid in settlement," with a creditor's statement of "[a]ccount legally paid in full for less than full balance." This information alone is equivalent to the information contained in Defendant's credit reports. That Defendant instead uses a notation of CLS ("Closed") in the initial box of the Payment History Grid of a consumer disclosure instead of "Settled"— or any of the other statuses which the numerical code 9 encompasses—does not mean that consumers are not receiving the equivalent of all of the information contained in their credit reports.

5    At the hearing, Plaintiffs' counsel indicated that the Court's conclusion that Plaintiffs could not establish willfulness would only dispose of class claims, not claims of the three named Plaintiffs. (MSJ Hr'g Tr. 42:5–14.) But Plaintiffs' SAC only invokes 15 U.S.C. § 1681n, which requires a showing of willfulness, and not 15 U.S.C. § 1681o, which instead requires a showing of negligence. (*See* SAC ¶¶ 108, 116, 124, ECF No. 56.)

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.